[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In their second amended complaint the plaintiffs Evandro S. Santini and Santini Homes, Inc., hereinafter referred to in the singular as "Santini" sought compensation and other relief against the town of Ellington, the Water Pollution Control Authority of the town of Ellington (WPCA) and the state of Connecticut, under a theory of inverse condemnation. The complaint against the town of Ellington and the WPCA has been withdrawn leaving only the claim against the state of Connecticut in the First Count of the second amended complaint.
The state has moved to dismiss this count for lack of subject matter jurisdiction on the grounds that Santini has failed to allege and/or failed to prove at the evidentiary hearing held, a taking by the state, thus depriving the Court of subject matter jurisdiction. (Without a taking the state is protected by its sovereign immunity).
The Court finds the issues in favor of the plaintiffs and, therefore, denies the Motion to Dismiss. An evidentiary hearing was conducted because there were genuine issues of material fact raised by the pleadings. See Standard Tallow Corp. v. Jowdy,190 Conn. 48, 56 (1983).
 Inverse Condemnation
The basis for a claim of inverse condemnation is that a particular governmental action has deprived a claimant of his property without just compensation. In this case the Court employs a balancing test to determine if a taking by inverse condemnation has occurred. The balancing test as set out inD'Addario v. Planning and Zoning Commission, 25 Conn. App. 137,143 (1991), requires the Court to consider:
 1. the degree of diminution in value of the particular piece of property.
 2. the nature and degree of the public harm to be prevented, CT Page 12246 and
 3. the realistic alternative uses available to the landowner.
"A determination of whether a taking has occurred must be made on the facts of each case with consideration being given not only to the degree of diminution in the value of the land, but also to the nature and degree of public harm to be prevented and to the alternatives available to the landowner." Chevron Oil Co.v. Zoning Board of Appeals, 170 Conn. 146, 151 (1976).
A taking may occur by a substantial interference with private property by which the owner's right to its use is substantially abridged. A substantial abridgement or interference cannot be precisely defined, but it is a developing concept, not a static one which involves the invasion of some specific legal interest in the property. Textron, Inc. v. Wood, 167 Conn. 334, 346-348
(1974).
 Discussion A. The plaintiff's protected property interest:
In 1984 Santini obtained an option to buy 20.3 acres in Ellington. The land was, and still is, zoned for single family residential development. It was located within an area designated by the WPCA as land upon which residential homes would be connected to the town's sewer system. In January 1985 Santini obtained approval to subdivide the parcel into 16 lots, to be known as Ellridge Estates. He then exercised his option to buy. The subdivision plan showed septic systems (not sewers) on the individual lots.
Thereafter, in September 1987, Santini purchased a second parcel of approximately 55 acres which was also within the sewer area. This parcel was in close proximity to the original 20 acre parcel. It was his expectation to extend the sewer line along the road fronting the 55 acre tract in order to sewer the residences to be built within it. It was his further expectation that as he developed the 55 acre tract he would run a sewer line into the neighboring 20 acre Ellridge Estates. While the 20 acre parcel and the 55 acre parcel do not abut, they are very close and separated by undeveloped land. Santini reasonably expected no problem in obtaining an easement or purchasing the small parcel needed to connect the two parcels he owned. He had developed 4 CT Page 12247 lots in Ellridge Estates with septic systems, but did that preliminarily for cash flow purposes. He did, however, fully anticipate sewering the remaining lots in Ellridge in addition to the 55 acre piece. To that end, in July 1985, Santini and the WPCA agreed that he would install a capped sewer line for Ellridge Estates and the WPCA approved an assessment of $1100 per lot, plus a value added charge when each house was constructed, plus a pro-rated cost of a pump station if one was going to be needed. Santini was also directed to construct the sewer line with a "gravity break" in the middle of the subdivision so that half of the sewers, when connected, would be easterly toward Pinney Street, where the main sewer line would run. Pinney Street was the frontage road for the 55 acre parcel. Accordingly, Santini installed the capped sewer at a cost of approximately $100,000 and conveyed an easement for the access road and the capped sewer to Ellington. Santini purchased the 55 acre parcel for $1,075,000. The purchase price reflected the fact that the property was located within a sewer district. According to testimony from a licensed real estate appraiser, the value of the 55 acre parcel would be reduced by approximately 80% without sewer approval. He also estimated the loss to Santini if he could not sewer the remaining lots in Ellridge Estates to be approximately $170,000. There were other substantial costs to Santini including increased property taxes from 1988 forward when the land classification was changed from agricultural to residential. In addition Santini borrowed more than $4.5 million for development costs between 1990 and 1991, on which substantial interest had to be paid.
Between 1984 and 1991 Santini, in reliance on the location of the property being in a sewer district, and with his expectations buttressed by his agreement with the WPCA as to a capped sewer line and positioning of gravity breaks, as well as the issuance of a development permit, very reasonably believed he had the right to connect his 75-acre development to a town sewer system. It was this property right with which the state substantially interfered.
 B. The degree of diminution to the value of the property:
As discussed above, in addition to substantial costs incurred by Santini, the value of the property was greatly diminished by the inability to tie into sewers. Clearly, the plaintiff has sustained a very substantial financial impact by the state's action which was taken without justification. CT Page 12248
 C. The nature and degree of public harm to be prevented:
In March 1991, the WPCA adopted a revised sewer facilities plan which deleted some 758 acres of land from the sewer district. This deletion included 65 of the 75 acres owned by Santini (A 10 acre section abutting the frontage road for the 55-acre tract purchased in 1987 remained in the sewer district). Following that action by the WPCA discussions took place between Santini and the WPCA as to reinstating the Santini property in the sewer district in light of the history between Santini and Ellington. The WPCA, apparently recognizing the inequity to Santini, voted to request the Connecticut Department of Enviromnental Protection (DEP) to approve Santini's request to reinstate his property into the sewer district. Although the letter was prepared it was never sent to the DEP. However in December 1992 the DEP threatened to withhold clean water fund assistance to the town of Ellington of mnre than $3 million. Based on that threat the WPCA was compelled to deny Santini's request for reinclusion. But for the threat of losing millions in funding, the WPCA would have approved Santini's request. Thus WPCA'S denial occurred solely because the town was threatened with the loss of over $3 million in state grant money.
The denial did not serve to protect agricultural land nor to advance any goal of food production. It did not serve any purpose regarding land use planning, the protection of environmentally sensitive areas or preservation of open space. There are no wetlands or watercourses on the property and there is ample sewage treatment capacity in the treatment plant to handle any sewage from the proposed Santini development.
Why then, did the DEP threaten Ellington with a potential multi-million dollar penalty? When Santini sought an explanation he was told by the DEP that the Connecticut Department of Agriculture (CDA) considered the property to be prime agricultural farm land and "extremely valuable for future agricultural needs." Therefore, he was told, CDA would oppose any change to the 758-acre deletion. This explanation was simply wrong. Indeed, at the hearing on this motion John Blum, who was then Commissioner of the CDA testified that he was concerned about the representations of William Hogan of the DEP to the effect that CDA was blocking Santini's request for reinclusion.
DEP's original flawed explanation was then revised. It then CT Page 12249 claimed that the removal of the 758 acres from the sewer district was in conformity with the policies of the Connecticut Conservation and Development plan and it just happened that Santini's 75 acres was part of that plan. While the overall plan may be advancing a legitimate governmental interest, there is no justification, under the particular circumstances of this case to remove the Santini property from the pre-existing sewer district.
It was concededly not farm land and it was clearly going to be developed as residential property. The DEP's subsequent reliance on Connecticut General Statutes §§ 22a-416 and 22a-1a
et seq and its CEPA program is misplaced. Water pollution concerns, as alluded to by the state cannot be affected by inclusion of the Santini property in the sewer district. The Court fails to see how there can be any degradation to water quality by sewering this development. It would seem evident that by eliminating the potential for septic system failures water quality can only be enhanced.
In sum, there is no public harm to be prevented by inclusion of Santini's property into the sewer district.
 D. Realistic alternative uses:
Santini has invested substantial amounts of money into this development, as above described. The highest and best use is as residential development. It is simply economically unfeasible, given the unique factual circumstances, to develop this property with septic systems without a heavy financial loss to the plaintiff. There is no equitable reason why Santini should unnecessarily be so negatively impacted.
 E. Other:
The plaintiff also claims that the DEP action was based on misconduct on the part of Messrs. Hogan and Smith in that they were improperly pursuing their own "personal agendas." The evidence presented at the hearing does not permit the Court to inferentially reach such a conclusion. However, the findings as discussed above do lead the court to conclude there was an inverse condemnation as a result of state action. The state's claim that any taking was the result of town action and not that of the state is not persuasive. The town was faced with a dilemma of the state's making. If it approved Santini's application as it wanted to do, it was jeopardizing over $3 million in state CT Page 12250 funding, according to the DEP. It was precisely this state action which caused the taking, and the action was simply unjustified. It served no legitimate public purpose, i.e., prevented no public harm. The financial investment made by Santini in reliance on his right to tie into a sewer system made the alterative use of septic systems impractical, and there was a substantial diminution in value to the property.
 Conclusion
The facts and circumstances of this case lead to the conclusion that there was an inverse condemnation and the Motion to Dismiss is denied.
Klaczak, J.